**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Cheryl A. HUNTE, Defendant–
Appellant.**

No. 97–3625.

United States Court of Appeals,
Seventh Circuit

Argued Oct. 26, 1999

Decided Nov. 4, 1999*

* The opinion is being issued in typescript.

Kit R. Morrissey (argued), W. Charles Grace, Office of U.S. Attorney, Criminal Division. Fairview Heights, IL, for plaintiff–appellee.

Brian E. Neuffer (argued), Winston & Strawn, Chicago, IL, for defendant–appellant.

Before WOOD, Jr., KANNE and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

Defendant Cheryl A. Hunte appeals her conviction and sentence for her role in an attempt to transport narcotics from Arizona to New York in 1997. The trial court sentenced Hunte to concurrent terms of thirty-three months imprisonment, two years supervised release and a $500 fine. On appeal, Hunte challenged the sufficiency of the evidence against her and the denial of a sentencing reduction under U.S. Sentencing Guidelines Manual § 3B1.2 for her minimal or minor role in the crime. We find the trial court erred in denying the § 3B1.2 reduction and remand the case to the trial court for re-sentencing. Recognizing that Hunte is due to be released in February 2000, we have expedited review of her appeal.

## I. History

### A. The Conspiracy

In March 1997, Hunte decided to accompany her boyfriend, now co-defendant, Joseph Richards, on a trip to California with an acquaintance known as Luis Gonzalez. Richards was a known drug dealer, and there was little mystery that the purpose of the trip was to purchase and bring back a load of narcotics. Richards supplied a minivan for the trip, and Gonzalez was to be the driver. Richards agreed to pay Gonzalez seven pounds of marijuana for help driving the van, purportedly to California. Hunte, on the other hand, stood to gain nothing from the deal. She apparently went along for the ride.

Richards directed the trip and made all or most of the decisions. Once on the road, he told Gonzalez that they were headed for Arizona, not California, and that he planned to pick up as much marijuana as he could get and bring it back to New York. Gonzalez would get his share and sell it for $8,000 to $9,000. Richards warned Gonzalez to drive safely and obey the speed limit and other rules of the road.

The three drove until they got to Tulsa, Oklahoma, where they rented a motel room. They showered but did not stay the night. Instead, leaving Hunte behind, Richards and Gonzalez went to meet Johnathan Warwick. Warwick was a Tulsa resident who rented a room from a man to whom Richards owed $3,000 for past drug dealings. Richards asked Warwick to help him drive to Phoenix (apparently not telling him for what purpose). Warwick agreed, believing that if the trip was successful, Richards would pay his friend the $3,000 Richards owed, and the friend would stop taking Warwick's disability checks for room and board. The three men picked up Hunte at the motel and left for Arizona.

Once back on the highway, Richards changed the plan again and said they were headed for Tucson, not Phoenix, and that their ultimate destination was Virginia, not New York. Warwick eventually figured out they were going to pick up drugs, but by this time they were in Texas. In Tucson, Richards made some calls from a pay phone at a convenience store, and eventually a man in a Chevy Blazer arrived who then escorted them to a house. Several hours later, a man came and took the minivan, returning it later loaded with

marijuana. Richards asked Gonzalez and Warwick to help him carry the marijuana into the kitchen. During this time, Hunte remained in the living room watching television. With Hunte in the other room, the three men weighed the bundles of marijuana. Richards cut one bundle open to make sure it was all marijuana and extracted some buds for sampling. Gonzalez testified at trial that Richards took precautions to keep Hunte out of the business aspects of the deal.

Hunte helped roll the buds into a joint and closed the window blinds while the group smoked the marijuana. Warwick, Richards and Gonzalez re-wrapped the marijuana and loaded it into the van. Richards' brother then arrived in a burgundy Nissan Maxima. After dropping off Richards' brother in Phoenix, Richards and Hunte drove to Tulsa in the Maxima, followed by Gonzalez and Warwick in the van. Hunte registered for a motel room for herself and Richards, while Gonzalez and Warwick registered for another room. Richards paid all expenses, including the motels, throughout the trip.

The next morning, March 25, 1997, the group awoke and continued to New York. In Illinois, state police pulled the minivan over and a search revealed the bundles of marijuana. Warwick and Gonzalez admitted they were following another car, and based on the information they supplied, the police radioed ahead and were able to pull over Hunte and Richards. Before they were stopped by police but after the minivan had been pulled over, Hunte and Richards had switched positions so that Hunte was driving. Hunte and Richards initially denied that they were traveling with the minivan and told police they had been traveling around the Midwest looking for farm equipment for Richards' Jamaican chicken farm. As their grasp of basic geography deteriorated, so did their cover story. Police matched fingerprints on the marijuana to Richards, but not to Hunte.

## B. The Trial and Sentence

Richards, Warwick and Gonzalez pleaded guilty to conspiracy and possession with intent to distribute almost 45 kilograms of marijuana. Hunte, like the others, was charged with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846; and possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1). Gonzalez and Warwick agreed to testify against Hunte at trial in exchange for one-third off their sentences. At trial, Hunte's primary defense was that she never possessed the marijuana because Richards was in charge and only he, Gonzalez and Warwick ever handled the bundles. Further, she contended that she was not a part of the conspiracy because she did not stand to gain from it.

The jury had difficulty with the concept of possession and sent a question to the judge asking for a clarification of the legal definition of constructive possession. Judge Stiehl referred the jury to the jury instructions, but otherwise provided no additional help. The jury found Hunte guilty on both counts.

At sentencing, Judge Stiehl denied Hunte reductions for acceptance of responsibility or for her minor or minimal role in the crimes. The court found that Richards was the leader of the group but that Hunte "actively participated" by driving the vehicle, making hotel reservations and providing cover for Richards. The court stated that it found nothing to justify either a minor or minimal role on Hunte's part. Hunte had no prior juvenile or adult criminal history and, therefore, qualified for a criminal history category of I. The total offense level for two counts was 20, which translated to a Guidelines range of thirty-three to forty-one months. Finding no aggravating circumstances, Judge Stiehl sentenced Hunte on October 8, 1997, to the bottom of that range.

## II. ANALYSIS

On appeal, Hunte raises two challenges. First, she contends that her involvement in

the crimes was too insubstantial to support either the conspiracy or the possession charges. Secondly, she challenges the trial court's denial of a reduction under § 3B1.2, which permits a two- or four-level reduction (potentially up to twelve months in Hunte's case) if the defendant played only a minor or minimal role in the offense.

■ In reviewing a jury's determination for sufficiency of the evidence, the court must view the evidence in the "light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Boykins*, 9 F.3d 1278, 1282 (7th Cir.1993). The court then asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* The denial of a downward departure under § 3B1.2 "will be affirmed if it results from a proper application of the sentencing guidelines to facts not found to be clearly erroneous." *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989); *see also United States v. Hagan*, 913 F.2d 1278, 1283 (7th Cir.1990).

### A. Sufficiency of the Evidence

#### 1. Conspiracy

■ Conspiracy under 21 U.S.C. § 846 requires that the Government establish the existence of an agreement between two or more persons "for the purpose of committing, by their joint efforts, a criminal act." *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993). The Government must show a "participatory link" between the conspiracy and the defendant. *United States v. Navarez*, 954 F.2d 1375, 1380–81 (7th Cir.1992). That link must be established by sufficient evidence demonstrating that the defendant knew of the conspiracy and intended to join its criminal purpose. *Id.* However, unlike liability for attempt, conspiracy liability does not require evidence of an overt act by the defendant, *see United States v. Shabani*, 513 U.S. 10, 15, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), *United States v. Pulido*, 69 F.3d 192, 208–09 (7th Cir.1995), and the phrase "participatory link" should not be confused in that way. Rather, the link simply provides a way to show that the defendant joined the conspiratorial agreement.

The evidence of Hunte's involvement in the conspiracy is slight. She appeared to have no role in planning the trip or securing any of the things necessary for its completion, such as the vehicles, cash or cohorts. She seemed to have no express understanding with Richards as to her involvement in the plan or share of the proceeds. She had no express responsibilities, did not negotiate the drug transaction and apparently was not needed to handle, weigh or transport the drugs.

■ However, the jury may consider "overt acts in furtherance of the conspiracy as circumstantial evidence establishing knowing participation in a conspiracy." *United States v. Burrell*, 963 F.2d 976, 988 (7th Cir.1992). The evidence shows that Hunte knew of the conspiracy's existence, as she spent several days traveling from New York to Arizona where the group picked up a large load of marijuana, sampled it, hid it in the minivan and returned toward New York. The question is whether she intended to join its criminal purpose and the bare overt acts committed in furtherance of the conspiracy establish that intent. For instance, a jury could find a participatory link between Hunte and the conspiracy from Hunte's closing the window blinds to hide their activities from view, helping to roll a joint for sampling, registering for the hotel room where the group rested, driving one of the vehicles used for transportation of the co-conspirators, and lying to police about their destination and about their association with Warwick and Gonzalez. The fact that she did not expect to share directly in the proceeds of the crime does not defeat a finding of knowing participation. A criminal without a profit motive is still a criminal as long as all elements of the crime are established.

### 2. Possession

Possession with intent to distribute marijuana requires the Government prove beyond a reasonable doubt that Hunte 1) knowingly or intentionally possessed the marijuana, 2) possessed the marijuana with the intent to distribute it and 3) knew the marijuana was a controlled substance. *See United States v. Hunter*, 145 F.3d 946, 950 (7th Cir.1998). The first element, possession, can be satisfied by direct or circumstantial evidence of constructive or joint possession. *See United States v. Tirrell*, 120 F.3d 670, 675–76 (7th Cir.1997); *United States v. Kitchen*, 57 F.3d 516, 520–21 (7th Cir.1995). Constructive possession applies when "a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Garrett*, 903 F.2d 1105, 1110 (7th Cir. 1990) (emphasis omitted); *see also United States v. DiNovo*, 523 F.2d 197, 201 (7th Cir.1975).

Hunte challenges her conviction on the theory that she did not exercise "dominion and control" over the marijuana because at all times Richards, as the group's leader, had exclusive control over the contraband. *DiNovo* stands for the proposition that "mere proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or the property on which it is found, is insufficient to support a finding of possession." *DiNovo*, 523 F.2d at 199. This line of cases protects the "ordinary bystander" who happens to be unlucky enough to be near someone who possesses contraband. *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir.1994). To this end, we have required that in non-exclusive possession cases, the evidence must show some nexus between the defendant and the drugs. *See United States v. Hernandez*, 13 F.3d 248, 252 (7th Cir.1994); *United States v. Perry*, 747 F.2d 1165, 1171–72 (7th Cir.1984);

*United States v. Galiffa*, 734 F.2d 306, 316 (7th Cir.1984).

*Galiffa* appears especially instructive in this case. In *Galiffa*, Stuart Ashenfelter and Thomas Galiffa rented a truck, Ashenfelter bought some boxes and the two drove to a forest preserve. Ashenfelter then proceeded alone to a hiding place where he retrieved the marijuana. He picked up Galiffa in the forest preserve and the two returned to their house. While Ashenfelter, Galiffa and another man were unloading the contraband, they were arrested. Galiffa challenged the sufficiency of the evidence on his conviction for possession. Galiffa argued that his mere presence in the truck, presence at the rear of the truck during unloading and flight from law enforcement officers were insufficient to establish his possession of the marijuana or his knowledge of the contents of the packages. This court held that "[r]esidence in a house used as a drug distribution center, and evidence of direct access to and participation in the marijuana distribution on the day of his arrest is enough to establish this nexus and, therefore, marijuana possession under 21 U.S.C. § 841(a)." *Id.* at 315.

As convincing as the proof against Galiffa, the evidence against Hunte more than substantiates the nexus between her and the contraband. There can be no doubt of her knowledge of the marijuana since she was present when it was delivered, unloaded, sampled and loaded. Although the evidence of her direct access to the drugs and participation in the transportation is minimal, it can hardly be said that she was in any sense an ordinary bystander. She registered for the hotel room, drove at least one of the vehicles, helped hide their activities from view and aided in the sampling of the drugs. She can no more claim to be a mere bystander than could Thomas Galiffa.

Hunte points to our decision in *Kitchen* as support for the argument that mere association or presence is insufficient to establish constructive possession. In

*Kitchen,* we dealt with two factual scenarios that implicate constructive possession. First, we held that proof of a defendant's access to a firearm, even when others also had access, was sufficient to allow a jury to find constructive possession. *Kitchen,* 57 F.3d at 521. In *Kitchen,* a firearm had been found in the bedroom of a house where the defendant occasionally stayed overnight. Evidence in that case, including the fact that the defendant resided at the house and that the room contained other possessions belonging to the defendant, established a nexus between the defendant and the firearm. *Id.* The fact that other adults likewise had access to the house did not negate a finding of constructive possession. *Id.* Here, the fact that Richards and the other two defendants had access to and possession of the marijuana did not defeat an inference that Hunte also possessed the marijuana since she too had knowledge of and access to it.

Hunte understandably focuses on the second holding of *Kitchen* in which we reversed a conviction for cocaine possession where the defendant had picked up the contraband for no more than two or three seconds. *Id.* at 521–24. We held that on a theory of actual possession, a momentary handling of the cocaine did not show automatically that the defendant had control over the contraband. *Id.* In contrast to the prototypical constructive possession case, which allows a conviction by showing a defendant controlled the contraband even if she never physically touches it, *Kitchen* says that a physical handling of contraband is not enough if it fails to demonstrate control. Both theories of possession require the defendant control the contraband to possess it, although that control is obvious in most actual possession cases.

While *Kitchen* correctly states the doctrines of constructive and actual possession, the analysis of that case does not help Hunte. Hunte argues that no evidence shows "she ever touched the bundles of marijuana," but that argument only

refutes actual possession and is not dispositive of constructive possession. Hunte further argues that only Richards had constructive possession of the marijuana, as shown by his offer to pay Gonzalez from the stash and to let Hunte sample some of it. While those facts provide strong evidence that Richards exercised control over the drugs, it does not necessarily mean Hunte and the others did not jointly possess them as well. As discussed above, control need not be exclusive.

The evidence showed that all four defendants were engaged in a plan to transport narcotics and that Richards was the leader of the group. The fact that one person leads and the others follow does not mean that only the leader has possession of the contraband. All four had access to the drugs at various times and assisted in their concealment and transportation. As a group, the four each exercised joint possession of the narcotics by virtue of their individual acts consistent with non-exclusive dominion and control over the contraband.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find Hunte guilty on both the conspiracy and possession counts. Therefore, we will affirm her convictions.

### B. Sentencing Guidelines § 3B1.2

We review a district court's refusal to give a downward adjustment based on § 3B1.2 for clear error, remembering however that the defendant has the burden of establishing his minor or minimal status in the crime by a preponderance of the evidence. *See United States v. Cain,* 155 F.3d 840, 844 (7th Cir.1998); *United States v. Castillo,* 148 F.3d 770, 776 (7th Cir. 1998). According to the Guidelines notes and our cases applying this section, a minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group." § 3B1.2 application note 1; *see also Castillo,* 148 F.3d at 776. The departure for minimal participants was intended to be used "infrequent-

ly." § 3B1.2 application note 2. A minor participant means "any participant who is less culpable than most other participants, but whose role could not be described as minimal." § 3B1.2 application note 3; *see also Castillo*, 148 F.3d at 776.

At the very least, we find that Hunte was a minor participant in that she was less culpable than most other participants. Hunte may in fact have been a minimal participant. The difference between minor and minimal depends on how the sentencing judge views the guilty conduct of the other participants. The former requires "less culpable than most" while the latter asks for "plainly among the least culpable."

These are not precise terms, but the suggestions that accompany the guidelines are helpful, as are comparisons to some of other cases interpreting this section. A minimal participant is one who unloaded a single shipment of marijuana in a large-scale smuggling operation, or once acted as a courier in a small smuggling operation. Application Note 2. Both examples suggest a participant who played a role necessary to the accomplishment of the crime.

In *Castillo*, we affirmed the trial court's denial of a reduction for a minor role because we found that each of the five charged defendants "was an essential component in this drug conspiracy." 148 F.3d at 776. For instance, one defendant provided a place for the smugglers to sleep, while another re-wrapped the marijuana. *Id.* None were entitled to the reduction. *Id.* Likewise, we affirmed the reduction denial in *Cain*, where the defendant "provided necessary services to the conspiracy by driving [a co-defendant], renting the car used to deliver drugs, and renting the apartment used to store them." 155 F.3d at 844.

While "minor" is not necessarily synonymous with "nonessential," Hunte's participation seems to fall well below the threshold established by the comments and cases interpreting § 3B1.2. Hunte helped hide the groups activities by closing the blinds, and registered for a motel room, but she was in no sense a courier nor did she help load or unload the drugs. She provided nothing "necessary" or "essential" to the operation.

Hunte unquestionably is less culpable than Gonzalez and Richards, who both stood to profit from the deal. Richards was the ring leader responsible for the entire operation, including arranging to meet the supplier and finishing the deal. Gonzalez came along only because he expected to participate in the deal as a vital player, a role that could be described loosely as a partner. Further, he carried the bundles of marijuana, helped with its packaging and helped drive the minivan.

The Government correctly points out that there were other participants, specifically the unnamed contacts and dealers in Arizona, but Hunte appeared less culpable than even these players. Although financial gain should not be the only, or even the dominant, factor in determining culpability under § 3B1.2, the Arizona contacts held much more critical and culpable positions in the deal. They were the suppliers who formed an integral link in the chain of drug trafficking that extends from growers to street dealers. Without them, there was no deal.

Only Warwick may have been less culpable than Hunte, but even he expected some financial reward—Richards' debt paid to Warwick's landlord—and he helped carry the bundles into the house and tended to the packaging and testing. By definition, Hunte appears to be "among the least culpable" even if Warwick and she were equally culpable.

 Clear error exists when, after reviewing the evidence, the court is "left with the definite and firm conviction that a mistake has been committed." *Herrera*, 878 F.2d at 1000. This is such a case. The evidence establishing Hunte's conviction, while sufficient, fails to show her participating in anything other than a minor or

minimal way. The offense definitions under §§ 841 and 846 do not ask or care whether a defendant's participation was minor or major, but the Sentencing Guidelines do. Here, we find the evidence indicates Hunte's role qualified her for at least a two-level reduction as a minor participant, although we leave it to the sound discretion of the trial court to determine whether she qualifies for a four-level reduction.

## III. CONCLUSION

We find that the evidence supports the defendant's conviction for conspiracy and possession with intent to distribute narcotics and AFFIRM her convictions. Because the sentencing court erred in rejecting a § 3B1.2 reduction, we REMAND the case to the district court for prompt re-sentencing consistent with this opinion.