In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1658, 09-1756 & 09-2242

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN DOE, a/k/a ADABERTO GUZMAN, a/k/a
JUAQUIN TAPIA, ANDRES CUELLAR-CHAVEZ, and
ENEDEO RODRIGUEZ, JR.,[1]

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:06-cr-00060—**Theresa L. Springmann**, *Judge.*

ARGUED APRIL 6, 2010—DECIDED JULY 20, 2010

Before KANNE, ROVNER, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Appellants were conspirators in a drug distribution ring. After their scheme was in-filtrated by an undercover officer and they were arrested,

---

[1] We will refer to Doe/Guzman/Tapia as "Tapia," and to Cuellar-Chavez as "Cuellar."

Appellants decided to take their chances at trial by jury. Following a five-day trial, each was convicted of conspiracy to possess with intent to distribute more than 100 kilograms of marijuana. The district court held sentencing hearings during which it overruled each defendant's sentencing objections and imposed a sentence on each defendant. Appellants now appeal their sentences, claiming that enhancements were improperly applied and reductions were erroneously ignored. We affirm.

## I. BACKGROUND

The criminal conduct in this case involved an extensive drug distribution scheme. Jose Hernandez first met Andres Cuellar-Chavez in Mexico in April 2006. Later that same summer, Hernandez, Jose Ramirez, and Enedeo Rodriguez decided that they wanted a shipment of marijuana to sell in Indiana. Hernandez spoke with his new friend Cuellar, who was still in Mexico, about transporting marijuana into the United States. Hernandez then traveled to Mexico to meet with Cuellar. At that meeting, Cuellar explained that he could acquire the marijuana and smuggle it across the border, but that they needed a truck driver to transport the drugs north to Indiana from Texas. Hernandez asked Rodriguez to assist in finding a driver. Rodriguez had an acquaintance—Juaquin Tapia—who supposedly could secure them transport.

Meanwhile, the Immigration Customs Enforcement Office ("ICE") in Brownsville, Texas, caught wind of the plan after receiving information that an individual

named Juaquin Tapia was looking for someone to transport 2,200 pounds of marijuana from South Texas to Fort Wayne, Indiana. ICE agents decided to infiltrate the conspiracy and requested that an undercover officer ("UC") pose as a truck driver and meet with Tapia.

A confidential informant then introduced the UC and Tapia in late August 2006. Tapia explained that he was looking for someone to transport between 1,200 and 2,000 pounds of marijuana from the Rio Grande Valley to Fort Wayne. The UC offered to transport the marijuana for a fee of $100 per pound. Tapia responded that he needed to talk to his contact first, but that he was going to request $20,000 to pay the UC. Tapia then explained that it would be a few days before they were ready for the transport. The UC gave Tapia his phone number and told Tapia to call him when the men were ready.

On October 9, 2006, Tapia called the UC to arrange an introduction between the UC and the owner of the marijuana. That afternoon, Tapia and the UC met in the parking lot of a retail store in Texas. In prepping the UC for the meeting with the owner, Tapia told the UC to request $125 per pound as a transport fee because Tapia needed to give someone else the extra $25 per pound. During this discussion, Tapia also told the UC that the men only had 600 to 700 pounds to load because 700 pounds had been heisted at the Mexican side of the border by gangsters known as "Zetas." He assured the UC, however, that the owner was trying to secure more marijuana to make up for the missing pounds so

that it would be worth the UC's while to complete the transport.

Tapia then left to pick up the owner of the marijuana. When he returned, he was with Cuellar, whom Tapia introduced as the person-in-charge and owner of the marijuana. Cuellar explained that they would have the load ready in a few days. During this meeting, Cuellar contacted someone by phone, inquiring whether the men could secure another load of marijuana so that the shipment contained at least 1000 pounds. Apparently thinking that this was possible, Cuellar then proceeded to tell the UC that he would pay him within two days of the UC's arrival in Fort Wayne.

Four days later, Tapia called the UC to request a meeting. The two agreed to meet later that day to discuss the logistics of initiating the transport. When Tapia arrived at the meeting, he informed the UC that the load was ready and waiting in Rio Grande City, Texas, but they would first have to discuss the plan for pickup with Cuellar. Upon meeting Cuellar, the three men sat in Tapia's vehicle, discussing the plan to retrieve the drugs. When the details were finalized, the UC drove his van to the stash house, following Cuellar. Tapia did not go to the stash house.

The stash house was located in a residential neighborhood. Cuellar, the UC, and an unknown male and female gathered behind the house and began loading the marijuana bundles onto the vehicle. Although the UC did not count the bundles of marijuana, he overheard Cuellar saying that there were eighty-three bundles in the load.

Two days later, the UC again met with Tapia in Texas. Tapia inquired about the size of the marijuana packages, and explained that both he and Cuellar would be waiting in Fort Wayne when the UC arrived with the shipment. Tapia then gave the UC $500 and left. The UC received an additional $990 and $980 in payment via wire from other unknown individuals. With those payments secured, the UC set out to transport the marijuana to Indiana.

Unbeknownst to Appellants, however, the UC actually delivered the marijuana bundles to ICE agents in Texas. The officials weighed the marijuana and then placed it in a secured vault pending a controlled delivery. The agents later placed the entire load—1,011 pounds—into lime boxes for transportation and shipped it to Indianapolis, Indiana by plane. The UC also flew to Indiana where he picked up the transported load and drove it to Fort Wayne.

Meanwhile, on October 17, 2006, Hernandez met with Tapia and Rodriguez in Indiana to discuss the delivery of the shipment the following day. Hernandez told the men that he was expecting the UC to call him when the marijuana had arrived.

The next day, the UC drove to a gas station near the Fort Wayne airport. He contacted Cuellar to tell the latter where he was waiting. During this call, Cuellar indicated that he and Tapia were already in Fort Wayne. Cuellar told the UC that someone would be at the gas station shortly to direct the UC to the offload spot, and in the meantime, to expect a call from "Jose." The UC soon received a call from Hernandez, who had arrived at the

gas station. The UC then followed Hernandez to a residence about five miles from the gas station. The residence, which was the place where the marijuana was to be offloaded, belonged to Ramirez.

But the detached garage was locked, and because Hernandez did not have a key, he tried to call Ramirez. While the men waited for Ramirez to return Hernandez's phone call, Hernandez removed a panel from the stereo area of his car and withdrew two bundles of U.S. currency totaling $15,000. Hernandez gave the money to the UC and explained that Ramirez would bring the remaining $15,000 to $20,000 owed to the UC.

Also while waiting for Ramirez, Hernandez received a call from Rodriguez who wanted to know if the marijuana had arrived and when he could come to collect it. Around the same time, the UC and Hernandez both saw the white van that Rodriguez drove slowly pass by Ramirez's residence. Hernandez told Rodriguez that he could not come over yet because it would look suspicious to have too many cars in front of the residence.

Unable to reach Ramirez, Hernandez was eventually able to obtain a key to the garage from a neighbor. He opened the door, and the UC backed the van into the garage. The UC and Hernandez then began to unload the marijuana. After the boxes were unloaded, the UC and Hernandez went to a local restaurant where they met Cuellar, Rodriguez, and Tapia. While Rodriguez talked on his phone, Tapia and Cuellar discussed the transport with the UC, inquiring about whether there had been any problems. Cuellar then offered to sell marijuana to Rodriguez for $525 per pound. Rodriguez agreed

but wanted to look at a sample, so Hernandez left the restaurant to obtain a sample from the stash waiting in Ramirez's garage.

When Hernandez arrived, Ramirez was home. The two went into the garage, closed the door, and began opening boxes. They were in the garage going through the boxes when law enforcement arrived. Officers arrested Ramirez and Hernandez and confiscated the marijuana and some scales. Agents also arrested Cuellar, Tapia, and Rodriguez at the restaurant.

At the state police post, the men were all advised of their rights and provided a written form in either English or Spanish. Tapia and Rodriguez chose English and Cuellar chose Spanish. Despite being advised of their rights, Tapia and Rodriguez both made incriminating statements, which they later unsuccessfully sought to suppress.

Both Hernandez and Ramirez pled guilty to the conspiracy charges against them, and Hernandez agreed to assist the government. A pre-sentence report (PSR) was prepared for each defendant. Ramirez was assessed various reductions—two levels for being safety valve-eligible, three levels for acceptance of responsibility, and two levels for his minor role. Hernandez was also assessed reductions—two levels for safety valve-eligibility and three levels for acceptance of responsibility. Hernandez received a sentence of thirty months' imprisonment while Ramirez received a sentence of thirty-seven months' imprisonment.

The remaining three defendants, Tapia, Cuellar, and Rodriguez, proceeded to trial. Following the five-day

trial, the jury returned separate guilty verdicts as to each defendant. PSRs for each defendant were submitted to the court. The PSRs assessed both Tapia and Cuellar two-level enhancements for their roles in the offense under U.S.S.G. § 3B1.1. Rodriguez was assessed a two-level enhancement for obstruction of justice. Prior to sentencing, Tapia, Cuellar, and Rodriguez all objected to the enhancements calculated in their PSRs, arguing that they played lesser roles in the conspiracy than the PSRs had determined. The district court overruled these objections and sentenced Tapia to 151 months' imprisonment, Cuellar to 121 months' imprisonment, and Rodriguez to 121 months' imprisonment. Tapia, Cuellar, and Rodriguez now appeal their sentences.

## II. ANALYSIS

We examine a trial court's interpretations of sentencing guidelines *de novo. United States v. Moreno-Padilla*, 602 F.3d 802, 807 (7th Cir. 2010). But we apply a clear error standard to the district court's factual findings, including the court's application of sentencing enhancements or reductions. *United States v. Rodriguez-Cardenas*, 362 F.3d 958, 959 (7th Cir. 2004). We will reverse a finding for clear error only when "our review of the evidence leaves us with a definite and firm conviction that a mistake has been committed*." United States v. Haynes*, 582 F.3d 686, 709 (7th Cir. 2009) (internal quotation marks omitted). A district court's decision about a defendant's role in an offense, however, is rarely reversed because that court is in the best position to evaluate the defendant's role in the criminal activity. *Id.* at 709-10.

The Sentencing Guidelines permit the application of various enhancements and reductions to a defendant's total offense level, depending on the criminal activity involved and the defendant's conduct during the course of the investigation and proceedings. *See generally* U.S.S.G. Ch. 1, Pt. 1, Subpt. 1., *et seq.* The enhancement applied to Tapia's and Cuellar's sentences in this case was U.S.S.G. § 3B1.1(c), which is appropriate if a defendant was an organizer, leader, manager, or supervisor in any criminal activity not otherwise accounted for in subparts (a) and (b). *See also United States v. Fox*, 548 F.3d 523, 529-31 (7th Cir. 2008). "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, Application Note 4.

When determining whether a person was an organizer, leader, manager, or supervisor, courts may consider

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* But "[n]o one of these factors is considered a prerequisite to the enhancement, and, at the same time, the factors are not necessarily entitled to equal weight." *United States v. Wasz*, 450 F.3d 720, 729 (7th Cir. 2006).

In fact, we have recognized that an enhancement may be appropriate even when the sentencing court does not make an explicit finding that a defendant exercised control; it is sufficient if the criminal activity involved more than one participant and the defendant played a coordinating or organizing role. *United States v. Young*, 590 F.3d 467, 472 (7th Cir. 2009); *United States v. Pira*, 535 F.3d 724, 729-30 (7th Cir. 2008); *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008). The reason for this reading of § 3B1.1(c) is that the aggravating role enhancement is designed to penalize more heavily those defendants who bear greater responsibility for crimes. *See* U.S.S.G. § 3B1.1, Background.

Paralleling § 3B1.1 is § 3B1.2, which provides that a defendant who is a "minimal" participant in criminal activity may receive a four-level decrease. *Id.* § 3B1.2. But this reduction is rarely applied. *See id.* at Application Note 4. A defendant is a minimal participant when he "plays [such] a minimal role" in the offense that he is "plainly the least culpable" of the participants. *Id.* A defendant can show that he was a minimal participant by demonstrating his lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others. *Id.* If a person is not a minimal participant, but is still less culpable than the average participant, the guidelines also provide for a downward adjustment of two levels for the defendant's "minor" participation. *Id.* at Application Note 5. And if a defendant is more than a minimal participant, but less than a minor participant, the court may reduce his sentence by three levels. *Id.* § 3B1.2.

The application of any of these enhancements or reductions is based largely on the facts of a particular case. *Id.* at Application Note 3(C). A defendant must prove his eligibility for a role reduction by a preponderance of the evidence, *United States v. Emerson*, 501 F.3d 804, 816 (7th Cir. 2007), and a district court's decision about a defendant's entitlement to a role reduction will be reversed infrequently, *United States v. Mendoza*, 457 F.3d 726, 729 (7th Cir. 2006). The mere fact that other conspirators were more involved does not entitle a defendant who was an essential component of the conspiracy to the reduction. *United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007).

With this context in mind, we turn now to the errors charged by Appellants.

### A. Tapia

The district court assessed Tapia a two-level enhancement because it found that he satisfied the definition of manager/supervisor under U.S.S.G. § 3B1.1(c). Tapia claims that the district court erred in finding that Tapia was a manager or supervisor and in failing to reduce Tapia's sentence under § 3B1.2. We disagree.

Looking to the relevant factors set out in § 3B1.1, we conclude that the district court did not clearly err in concluding that Tapia played a managerial or supervisory role in the conspiracy. First, Tapia was in charge of recruiting other participants, namely, the driver. Second, although Tapia had to get confirmation from his fellow conspirators, he was in charge of negotiating

the price with the driver. This certainly involved the exercise of some decision-making authority. Finally, the nature of Tapia's participation was such that he was involved in the process from start to finish. He first secured the driver, without which the conspiracy surely would have been stillborn. He then remained the UC's main contact, and was in charge of coordinating meetings between Cuellar and the UC. He also orchestrated the logistics of transportation, including the initial pickup of the drugs and the UC's communication with Cuellar. Similarly, Tapia ensured that the venture succeeded by having repeated meetings with the UC. He also was present in Indiana when the UC arrived with the marijuana.

The district court recognized that while supplying drugs or negotiating their sale does not, by itself, justify an enhancement, Tapia had more involvement than simply supplying or negotiating. We think this assessment was correct, based on the degree of Tapia's participation, the control he exercised over others, and his continuing involvement in ensuring the conspiracy's success.

Tapia also argues that the court erred when it failed to recognize that §§ 3B1.1 and 3B1.2 are not mutually exclusive. Particularly, Tapia had argued for a three-level reduction in his sentence due to his claimed minimal/minor role, but the court found that because Tapia was receiving an enhancement under § 3B1.1, he was ineligible for a reduction under § 3B1.2. Tapia based this argument on our decision in *United States v. Jackson*, where we commented that "Section 3B1.2 does not say that a manager or supervisor cannot be a minor partici-

pant; all that is required is that he be less culpable than most of the other participants." 207 F.3d 910, 922 (7th Cir. 2000), *rev'd on other grounds*, 531 U.S. 953 (2000). We opined that it was incorrect to assert that "there can never be a situation in which a defendant could receive both a punishment bonus for being a manager or supervisor and a punishment decrease for being a minor participant." *Id.*

Based on *Jackson*, we agree with Tapia that it was error for the district court to conclude categorically that when a defendant receives an enhancement under § 3B1.1, he is automatically ineligible for a reduction under § 3B1.2. This conclusion is of no matter, however, because any error on the district court's part is harmless. Tapia is not the ideal candidate to test our ruminations that one can simultaneously receive an enhancement under § 3B1.1 and a reduction under § 3B1.2. Tapia was not a minimal/minor participant in the scheme; in fact, he was significantly involved, as demonstrated by the evidence already discussed.

Tapia's own claim that he was less culpable than other participants is not enough to obtain a reduction. He must demonstrate this by a preponderance of the evidence, *Emerson*, 501 F.3d at 816, and he has failed to do so. In fact, the evidence he points to in support of his claim is simply incorrect. For example, Tapia asserts that he did not receive proceeds from the conspiracy even though he actually received $7,500. He further attempts to minimize his role by claiming that he was only responsible for finding the driver. But, as discussed above,

Tapia did more than secure a driver. He negotiated fees with the driver, arranged meetings between himself, Cuellar, and the UC, and helped ensure the conspiracy's success by traveling to Indiana.

And even if we were to simply adopt Tapia's claims that other conspirators were more involved, that alone does not entitle him to a reduction because he was an essential component in the conspiracy. *United States v. Gonzalez*, 534 F.3d 613, 616 (7th Cir. 2008). Securing transport for the marijuana was essential to the conspiracy's success. Tapia was essential to that goal, not only because he found the driver, but also because he directed the driver throughout the course of the conspiracy.

For these same reasons, the district court was also correct in finding that Tapia was not a minor participant deserving of a two-level reduction. Although the minor participant reduction is not subject to the same limited usage as the minimal participant reduction, the court must still consider Tapia's involvement in assessing his worthiness of the reduction. *See United States v. Hunte*, 196 F.3d 687, 693-94 (7th Cir. 1999). As we have already determined, Tapia's involvement was substantial and essential to the conspiracy's success. He is therefore unworthy of the reduction for being a minor participant.

Tapia also claims that the district court judge was biased against him because the court believed that Tapia lied about his ability to speak English. Tapia claims that as a result of the judge's bias, he was denied the minor-role reduction.

There is no evidence that the court was biased against Tapia. Rather, the court concluded that Tapia attempted to obstruct justice by claiming that he did not understand English even though the court witnessed Tapia speaking English with his attorney. The court's decision to enhance Tapia's sentence was not based on bias, but instead on its impression that Tapia had lied. Furthermore, because Tapia raises this argument as part of his role-reduction argument rather than as a separate argument challenging the obstruction of justice enhancement, the district court's impression of Tapia's verity matters little. Tapia was not denied a role reduction because the court thought that he lied, but rather because the court found that his involvement was too significant to be minor. We have already affirmed the district court's findings in this regard, and we need not dwell on them further. The district court did not err in refusing to grant Tapia a sentence reduction.

### B. Cuellar

Like Tapia, Cuellar argues that the court erred by increasing his sentence under § 3B1.1. Cuellar also claims that the court erred in finding that he was not safety-valve eligible. Finally, he argues that the court incorrectly applied the 18 U.S.C. § 3553(a) factors in sentencing him to the maximum recommended sentence under the guidelines rather than considering the sentences of his co-defendants. We take each argument in turn.

Cuellar's first argument is almost too meritless for us to consider. Despite the substantial evidence pointing to Cuellar's role as a leader in the conspiracy, he argues that he was just a "middleman." The thrust of Cuellar's argument is that because he was working at the direction of a supplier in Mexico, he was not a manager or supervisor.

We begin with the factors that § 3B1.1 instruct courts to consider. First, it is evident that Cuellar exercised decision-making authority. He determined the date on which the shipment would leave Texas, the ultimate fee paid to the UC, and the amount that Rodriguez would pay to purchase marijuana, among other things. Second, the nature of his participation was such that the other participants viewed as him as the leader, and the evidence supports their perceptions. For example, Cuellar arranged the initial transport, storage, and loading of the marijuana for its ultimate delivery in Indiana. He determined the dates of shipment, and was also in charge of paying everyone once the marijuana was successfully delivered. These are certainly the activities of a leader. Third, he exercised a significant degree of participation in the planning of the offense. As mentioned, he determined the dates and times that the shipment would leave and the location of the safe houses. He also met with the UC and Tapia on a few occasions to discuss details of the conspiracy. Cuellar traveled to Indiana to help ensure that the conspiracy was a success. And, perhaps most importantly, he was the person in charge of securing passage of the shipment from Mexico into this country, and in procuring more marijuana when half of the

original shipment was stolen at the border. Finally, Cuellar exercised a significant amount of control over other participants. He demanded meetings with Tapia and the UC, directed Hernandez to secure a driver, and ordered Hernandez to meet the UC for unloading.

As in Tapia's case, the district court recognized that a defendant's role as the supplier of drugs, standing alone, is unworthy of the enhancement. But the court found that Cuellar did more than simply supply the drugs. We agree that the evidence detailed above is more than enough to support the district court's conclusion. Therefore, the district court did not err in enhancing Cuellar's sentence.

Because we find that Cuellar's sentence was properly enhanced under § 3B1.1 for his aggravating role, he is ineligible for application of the safety-valve provision contained in U.S.S.G. § 5C1.2. Section 5C1.2 of the Sentencing Guidelines provides that a defendant convicted of certain offenses may receive a two-level reduction in his total offense level, as well as a sentence below the mandatory minimum sentence fixed by statute, if the defendant meets all of five enumerated criteria. One of those criteria is that a defendant was *not* an organizer, leader, manager, or supervisor of others. *Id.* Because we agree with the district court that Cuellar was a manager or supervisor, he was not eligible for a safety-valve reduction.

Finally, Cuellar argues that the court incorrectly applied 18 U.S.C. § 3553 by refusing to consider the disparity between Cuellar's sentence and those of his co-defendants.

In *Gall v. United States*, the Supreme Court commented that "[s]ection 3553(a)(6) requires judges to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 552 U.S. 38, 54 (2007) (internal quotation marks omitted). Cuellar argues that *Gall*, in combination with § 3553, required the district court to sentence him to less than the maximum recommended sentence because his co-conspirators all received less time.

A within-guidelines sentence is entitled to a presumption of reasonableness on appeal. *Id*. at 57. Because Cuellar's sentence was within the recommended guidelines range, we presume that it is reasonable. *Gall* certainly does not *require* district courts to sentence similarly situated defendants the same. And even if it did, Cuellar was not similarly situated to his co-defendants. Although Hernandez and Ramirez pled guilty, both received reductions for acceptance of responsibility and safety-valve eligibility. Hernandez also cooperated with the government, and Ramirez received a reduction for his minor role. These differences resulted in very different recommended sentencing ranges, and therefore, these defendants were not similarly situated to Cuellar. Any sentencing disparity between them and Cuellar was thus warranted.

With regard to the sentences imposed on Tapia and Rodriguez, there is little disparity with Cuellar's sentence. As mentioned, Tapia received the longest sentence of the three—151 months. Cuellar cannot complain that his sentence was not on par with Tapia's, unless he is re-

questing more prison time. Because we assume he is not, and because his sentence of 121 months' imprisonment was the same as the one given to Rodriguez (whose sentence was enhanced for obstruction of justice), Cuellar's § 3553 argument fails.

*C. Rodriguez*

Finally, Rodriguez argues that the district court erred in denying him a participant-based reduction. Specifically, he claims that the court erred by failing to compare him to conspirators who were "average participants." If the court had compared him to average participants, so goes the argument, it would have found that he was a minimal participant.

Rodriguez initially argues that because he stood trial with the "leaders" of the conspiracy, his role was determined average "by default." Rodriguez is simply incorrect. He was not deemed an average participant by default; rather, he was deemed an average participant because his conduct was essential to the conspiracy, even if it was less significant than that of the leaders. Although his involvement was certainly less substantial than Tapia's and Cuellar's, that alone does not mean that the court erred in denying him a reduction. When a defendant serves an essential role in the conspiracy, he is not entitled to a reduction simply because other conspirators were more involved. *Gallardo*, 497 F.3d at 741. Rodriguez was integral to the conspiracy's success, and the district court made an explicit finding that Rodriguez's involvement was such that he did not deserve a reduction.

The court had ample evidence on which to base such a conclusion. First, Rodriguez's participation in the offense was essential to its success. He helped initiate the conspiracy and was integral in the planning. He first provided Tapia's number to Hernandez. Rodriguez also arranged for Tapia's flight to Indiana by requesting that his girlfriend purchase the ticket. Once Tapia was in Indiana, Rodriguez picked Tapia up from the airport, hosted him overnight, and chauffeured him around during his stay in Fort Wayne. Second, he was directly responsible for recruiting Tapia and was indirectly responsible for recruiting the UC. Third, he "coordinated" the activities of others, both in directing Tapia to hire a driver and in arranging Tapia's trip to Indiana. Finally, Rodriguez had extensive knowledge of the scope and inner workings of the conspiracy, as demonstrated by his statements to arresting officers and the evidence of his involvement. The fact that he possessed such extensive knowledge of the conspiracy significantly deflates the strength of his minimal-role reduction claim in light of § 3B1.2's dictates. U.S.S.G. § 3B1.2, Application Note 4. The district court did not clearly err in determining that Rodriguez was unworthy of a sentencing reduction, even if Tapia and Cuellar were more culpable.

But that does not dispose of Rodriguez's argument that the court erred by failing to compare his participation with Ramirez's and Hernandez's in assessing whether his role was minimal. He claims that when his conduct is juxtaposed with their conduct, it is evident that he is worthy of a minimal role reduction. Rodriguez fares no better on this argument.

Even if the court should have expressly compared Rodriguez's conduct to Hernandez's and Ramirez's, the result would have been the same, rendering any potential error harmless. Ramirez was the only defendant who received a participant-based reduction for his minor role; no defendant received a minimal-role reduction. The district court found that Ramirez was worthy of the reduction because his role in the offense was limited to providing the stash house and paying the driver the remainder of his fee.

Hernandez, who was deemed an average participant, received no reductions or enhancements. His conduct included initiating the conspiracy, paying the UC upon arrival in Indiana, and offloading the marijuana at Ramirez's home. The court recognized that Hernandez was more involved than Ramirez, but less involved than Tapia and Cuellar. Rodriguez's conduct was also more extensive than Ramirez's and on par with Hernandez's. Therefore, the court did not err in denying Rodriguez a participant-based reduction.

But Rodriguez argues that *United States v. Hunte*, 196 F.3d 687 (7th Cir. 1999) compels the opposite conclusion. In *Hunte*, we reversed a trial court's determination that a conspirator was undeserving of a reduction because she "actively participated" in the conspiracy. We reasoned that as compared to other conspirators, Hunte was among the least, if not the least, culpable. *Id.* at 690. *Hunte* is inapposite for one obvious reason— Rodriguez was not the least culpable defendant. His argument is therefore without merit.

### III. CONCLUSION

Because the district court did not clearly err in sentencing Tapia, Cuellar, or Rodriguez, we AFFIRM.