In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-4344

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD BAKER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 30049—**Richard Mills**, *Judge.*

ARGUED SEPTEMBER 15, 2005—DECIDED FEBRUARY 17, 2006

Before FLAUM, *Chief Judge*, and RIPPLE and KANNE,
*Circuit Judges.*

KANNE, *Circuit Judge.* Richard Baker was charged in
a third superseding indictment with three counts of being
a felon in possession of a firearm, in violation of 18 U.S.C.
§ 922(g)(1). He was convicted on all counts after a jury trial,
and he was sentenced to 234 months' imprisonment for each
count, to be served concurrently. Baker now challenges his
convictions on appeal. For the reasons set forth below, we
affirm in all respects.

## I. BACKGROUND

Prior to and during Baker's trial, Baker sought to present two affirmative defenses—an entrapment by estoppel defense and a public authority defense. He also sought to make use of the statutory defense contained in 18 U.S.C. § 925(a)(1), arguing that when he possessed the firearms, he was acting under the authority of a law enforcement official. Prior to trial, the district court granted two motions in limine filed by the government, which resulted in orders that precluded Baker from presenting any evidence relating to these three defenses. It is the granting of these two motions in limine that comprise the bulk of Baker's appeal.

Initially, we recount the testimony adduced at the pretrial suppression hearing, as Baker and the government rely on a good portion of it in support of their arguments.[1]

*A. The Government's Evidence*

During the months of June 2002 and January 2003, a number of burglaries and thefts occurred throughout several neighboring counties in central Illinois. The burglars had targeted schools, businesses, municipal government offices, and police stations and vehicles, and had stolen laptop computers, audio-visual equipment, tools, office supplies and equipment, and construction equipment. The burglars had also stolen at least three shotguns from the police stations and police vehicles.

State and local law enforcement agencies formed a joint task force to investigate the burglaries. They initially believed that all the burglaries were committed by the same persons, and ultimately began to suspect Jeffrey

---

[1] Baker does not contest the district court's rulings on the underlying motions to suppress.

and Michael McCall of Clinton, Illinois. On January 16, 2003, DeWitt County Sheriff Roger Massey and Illinois State Police Investigator Greg Lindemulder, lead investigators in the case, obtained and executed a search warrant for the McCalls' residence. During the execution of the search warrant, Baker showed up at the residence. Massey approached Baker, and after telling Baker he could not enter the house, asked if he would be willing to speak with Massey about the burglaries and stolen property. Baker agreed, and he voluntarily met with Massey and Lindemulder the next day at the DeWitt County sheriff's department.

According to Massey, at this meeting, Baker said Jeffrey McCall had brought several items, including laptop computers, to his house, which McCall was offering for sale. Baker said he no longer had any of the laptops, as he resold one of the laptops and returned the rest to McCall. At the end of the meeting, Massey told Baker there was one more item they needed to discuss. Baker hung his head low, paused for 30 to 45 seconds, and stated, "You must mean about the shotguns." Baker then recounted how McCall had also brought him three shotguns and how Baker had sold them to a man in Chicago for $100 each. After some encouragement from Massey, Baker agreed to attempt to retrieve the shotguns from the man in Chicago.

The next day, January 18, 2003, Baker delivered to Massey and Lindemulder a shotgun, which had previously been stolen from the Mansfield police department, along with an air nailer and a calculator. According to Massey, Baker said he repurchased the shotgun from the man in Chicago for $600. Pursuant to Baker's request, Massey reimbursed him. Baker then indicated he would attempt to retrieve the other two shotguns. Baker also agreed to maintain telephone contact with Massey, and keep Massey informed as to his whereabouts.

On January 19, 2003, Baker was found asleep in his car in Dyer, Indiana, by a local police officer. A consensual search of the car revealed several laptop computers in the trunk. At Baker's insistence, the officer called Massey and described what he found. Baker was released; however, Massey obtained a search warrant for Baker's car and residence the next day. Massey and Lindemulder suspected Baker had lied to them earlier when he had stated he no longer had any of the laptops. Massey was also suspicious because Baker had not maintained telephone contact with Massey as agreed.

On January 20, 2003, Baker returned to the DeWitt County sheriff's department. Massey searched Baker's car pursuant to the search warrant. Massey found a stolen police shotgun (the second shotgun retrieved) and three laptop computers in the trunk. According to Massey, after Baker was confronted with the items and Massey's suspicions, Baker admitted he lied at their previous meetings. Massey testified that Baker also admitted that he did not sell any of the shotguns to a man in Chicago; rather, Baker had retained possession of the shotguns and other property the entire time. In fact, Baker stated, the third shotgun was located at a junkyard in Farmer City. Massey sent a deputy with Baker to the junkyard, where Baker retrieved the third shotgun, along with two rifles. Baker was then arrested.

## B. Baker's Versions of Events

Upon taking the witness stand, Baker told a different story. Baker testified he possessed the shotguns because he was acting under Massey's authority. Baker claimed that Massey showed him a deputy United States Marshal's badge at their first meeting and stated there would be "no case" against Baker if he helped with the retrieval of the shotguns from the man in Chicago.

However, during cross-examination, Baker revealed that he had testified earlier under oath in a state court case that he had acquired the shotguns from Jeffrey McCall, and further that Baker had, indeed, been in possession of the shotguns the entire time.

Baker's story changed once again after the start of the trial. On the stand again, Baker admitted he never sold the shotguns to a man in Chicago, despite his contrary statements to Massey. He also testified he was never in possession of the shotguns, however, because he never actually touched them, as they were wrapped in a bag, and he only touched the bag. He also testified he did not tell Massey about the true location of the shotguns because he wanted to be able to obtain money from the sheriff for each one.

## II. ANALYSIS

At the outset, we note Judge Mills was confronted with a situation where a defendant changed his story several times. When the judge decided to preclude Baker from presenting certain defenses, he was aware of some of Baker's previous inconsistent stories. As a result, he found the testimony of three police officers "to be more credible than" Baker's. Furthermore, the judge noted Baker testified in a previous state court hearing that he had been in possession of the guns the entire time, something that was inconsistent with Baker's line of proposed defenses. In the end, it appears the judge decided Baker could not change his story at that point and present defenses that were contrary to this prior testimony. Additionally, there was a significant amount of contrary evidence before the court which made Baker's most recent story all the more incredible.

We are mindful and appreciative of the role of the district court judge in deciding issues of credibility. *See United States v. Zambrana*, 428 F.3d 670, 676 (7th Cir. 2005)

(noting "[a district court] has the institutional capacity to make findings of historical fact as well as all-important credibility judgments."). However, we have explained that a court may preclude an affirmative defense by motion in limine only where the court accepts as true the evidence proffered by the defendant and finds that the evidence proffered by the defendant, even if believed, would be insufficient as a matter of law to support the affirmative defense. *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002).

In Baker's case, the court simply did not believe his new story that allegedly supported his defenses. Although our own review of the record reveals this was understandable, in light of *Tokash*, the court should not have relied on a credibility determination to preclude the presentation of Baker's defenses. But, as will be seen, the mistaken exclusion based on credibility does not carry the day for Baker. Even if we assume Baker's initial proffered facts at the suppression hearing were true, we find they were insufficient as a matter of law to support the defenses, and, in the end, there was no error in their exclusion.

## A. *Entrapment by Estoppel and Public Authority Defenses*

Both the government and Baker go to great lengths to explain the supposed difference between the entrapment by estoppel defense and the public authority defense. The parties rely heavily on cases from other circuits to argue there is indeed a difference between the two. A review of our own decisions does not reveal much in the way of useful analysis, although this is not surprising. *See United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994) (explaining how the entrapment by estoppel defense is rarely available); *United States v. Pitt*, 193 F.3d 751, 756 (3d Cir. 1999) (explaining that published decisions pertaining to the defense of public authority are sparse, possibly because

reliance on it is rare). In fact, what little discussion there is from our own circuit may indicate the defenses are not separate at all, but that the descriptions are merely synonymous. *Cf. United States v. Neville*, 82 F.3d 750, 761 (7th Cir. 1996) ("'[P]ublic authority[ ]' [is] sometimes called 'entrapment by estoppel'[.]").

The elements that comprise the two defenses are quite similar. The entrapment by estoppel defense applies "when, acting with actual or apparent authority, a government official affirmatively assures the defendant that certain conduct is legal and the defendant reasonably believes that official." *Id.* As for the public authority defense, other circuits have held the defense applies when a government official authorized the defendant to perform an act that would otherwise be a crime, and the official had the *actual* authority to grant such authorization. *See, e.g.*, *United States v. Fulcher*, 250 F.3d 244, 254-55 (4th Cir. 2001); *Pitt*, 193 F.3d at 757-58; *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); *United States v. Duggan*, 743 F.2d 59, 83-84 (2d Cir. 1984).

Most of these cases from other circuits generally limit the public authority defense to those situations in which the government official *in fact* had the authority to empower the defendant to perform the acts in question. This is despite the language of Federal Rule of Criminal Procedure 12.3(a)(1), which states, "If a defendant intends to assert a defense of actual *or believed* exercise of public authority on behalf of a law enforcement agency . . . at the time of the alleged offense, the defendant [must notify the government and the court]."[2] (emphasis added).

---

[2]  By pointing out the apparent inconsistency between the other circuits' decisions and the language of Rule 12.3(a)(1), we do not intend to imply the other circuits were somehow incorrect.
(continued...)

We have not explicitly stated whether the public authority defense is limited to those situations in which the government official had actual authority, as opposed to simply apparent authority, nor do we need to make such a statement today to resolve Baker's case. As the parties argue it, the only difference between the entrapment by estoppel defense and the public authority defense is that the former requires either actual or apparent authority, while the latter requires only actual authority.

We need only address Baker's argument regarding the entrapment by estoppel defense, as that will cover both situations, i.e., a government official with actual authority and one with apparent authority. This does not deprive Baker of anything as far as his arguments go, and saves needlessly delving into an ancillary question that is best saved for another day.

## B. Actual Authority

The first issue is whether Sheriff Massey had actual authority to assure Baker that Baker's possession of the guns was legal. *See Neville*, 82 F.3d at 761; *cf. Duggan*, 743 F.2d at 83-84 (public authority defense requires government official to have actual authority to authorize violation of federal law). If true, and all the other requirements of the defense were met, then Baker should have been entitled to present the defense. Unfortunately for him, Baker points to no evidence whatsoever that Massey indeed had such actual authority.

As an initial matter, we note local law enforcement officials, like Sheriff Massey, generally do not have the

---

[2] (...continued)
Rather, we highlight the difference merely to emphasize the issue is more complicated than it first appears.

authority to exempt individuals from violations of federal firearm laws. *United States v. Achter*, 52 F.3d 753, 755 (8th Cir. 1995); *see United States v. Spires*, 79 F.3d 464, 466-67 (5th Cir. 1996); *United States v. Hurst*, 951 F.2d 1490, 1499 (6th Cir. 1991) (noting state officials could not exempt violations of federal gambling laws). Under normal circumstances, our inquiry would end here, but Massey is not only a local law enforcement official, he is also a Special Deputy United States Marshal.

According to Baker, he refused to assist Sheriff Massey in retrieving the guns until the "feds" were contacted. Apparently, Baker was concerned he would be committing a federal crime if he were to possess the guns, as he had previously been convicted of a felony. *See* 18 U.S.C. § 922(g). At this point, according to Baker, Massey pulled out a U.S. Marshal's badge, showed it to Baker, and stated he (Massey) was acting on behalf of the U.S. Marshals so there would be "no case" against Baker if he helped with the retrieval of the guns. Of course, Baker testified it was only then that he began assisting Massey. Even if we were to believe this story (which the district court clearly did not), Baker proffered no evidence Massey had the actual authority to excuse Baker's possession of the guns.

What Baker did proffer was the affidavit of Bruce Harmening, a supervisory deputy U.S. Marshal. In the affidavit, Harmening stated Massey had been deputized as a Special Deputy U.S. Marshal in furtherance of the Great Lakes Regional Fugitive Task Force (GLRFTF). The mission of the GLRFTF is to pursue and apprehend federal and state fugitives wanted for felonies. Massey's authority "'can only be exercised in furtherance of the mission for which he . . . has been specially deputized,' and 'as directed by an appropriate official of the United States Marshals Service.'" Furthermore, the GLRFTF supports Project Safe Neighborhoods, which authorized Massey to

seize and make arrests for illegal guns when "identified in connection with fugitive investigations."

Baker's testimony and Harmening's affidavit did not establish that Massey had the actual authority to assure Baker his possession of the guns would be legal. Massey's authority under the GLRFTF extended only to its mission, i.e., the pursuit and apprehension of fugitives. First, there were no fugitives involved in the case and Massey's investigation did not relate to the apprehension of any fugitives. Rather, the investigation was focused on burglary and the theft of police firearms and other items. Second, Baker introduced no evidence that Massey had been "directed by an appropriate official of the United States Marshals Service" to approve Baker's possession of the guns. As a result, the district court did not err in excluding the introduction of the entrapment by estoppel and public authority defenses, at least to the extent they relied on Massey's actual authority.

## C.  Apparent Authority

Assuming for a moment Massey did display his U.S. Marshal's badge to Baker, the second issue is whether Baker was entitled to present his entrapment by estoppel defense based upon Massey's apparent authority. Massey had initiated his contact with Baker as a county sheriff, not as a deputy U.S. Marshal. Massey asked Baker to contact him in his capacity as sheriff. Massey asked Baker to meet with him at the local police department, which Baker did. Baker then met with Massey and a state law enforcement officer at the local police department. Baker was, in fact, known to local law enforcement, and he knew Massey was the county sheriff. It is also important to emphasize Baker had the weapons before the first meeting with Massey.

First, we have held that the entrapment by estoppel defense does not apply when a defendant charged with a

federal crime claims to have been misled by a state official. *United States v. Rector*, 111 F.3d 503, 506 (7th Cir. 1997) ("[T]his court would be going against the weight of authority if it ruled that statements by state law enforcement officials may constitute a defense of entrapment by estoppel to federal charges."), *overruled on other grounds by United States v. Wilson*, 169 F.3d 418, 428 n.9 (7th Cir. 1999); *see United States v. Funches*, 135 F.3d 1405, 1407-08 (11th Cir. 1998); *United States v. Caron*, 64 F.3d 713, 714-17 (1st Cir. 1995). Utilizing the same reasoning from these cases, we reach a similar conclusion in that Baker could not use the entrapment by estoppel defense, as any alleged misrepresentations were made by a law enforcement official in a context in which it was clear the official was using authority bestowed upon him by the state, as opposed to the federal government.

Second, as we have stated, the entrapment by estoppel defense requires that the government "actively mislead the defendant; and that the defendant's reliance be actual and reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation." *Neville*, 82 F.3d at 761 (quotations omitted). The defense is a narrow one, *see Howell*, 37 F.3d at 1204, and it requires the defendant to show his reliance on the alleged misrepresentations was reasonable and in good faith. *Rector*, 111 F.3d at 506-07. Baker must show the federal government clothed Massey with apparent authority to speak on its behalf. Overall, we do not find the defense was available under the facts of this case, nor do we find Baker's alleged reliance on Massey's apparent authority to have been reasonable.

Baker's purported reliance could not be based on the alleged misrepresentation of Massey. Baker's testimony on direct examination at the motion to suppress hearing on this issue was sketchy at best. Because of the importance

of Baker's version of events, we recount his complete direct examination:

Q. You've heard the testimony of the officers today, right?

A. Yes, sir.

Q. Now, if I could call your attention to January 20th, do you recall—January 20th of 2003, did you have any conversations with the sheriff by telephone that day?

A. Yes, I did.

Q. And how many telephone conversations did you have?

A. Three phone calls.

Q. And what did you say in those calls?

A. I told him—initially there was discussion about getting more money.

Q. Okay.

A. And then later on he said to come back—on back to Farmer City. And I came back to Farmer City and called him on his cell phone and told him I was en route from Farmer City to Clinton to the police station.

Q. Did you tell him whether you had anything that he wanted in your car?

A. Yes, I did.

Q. You heard the two officers' description of the interviews that you had with them on January 18th and January 20th and they testified that they never told you that there—they never promised you that you wouldn't be charged if you talked to them. Is that correct?

A. That's not true.

Q. What did they promise you?

A. Originally it started off with the State Police—I can't hardly say his name—Lindemulder.

THE COURT: I didn't hear that. It started off with the State Police what?

A. The State Police guy that was up here, he initially said, "We need you to start working for us." That was on the original—first time I met with him. And we started from there on. Okay. But it wasn't him. It was Roger Massey that told me if I'd help them—he told me that, "These guns, we need to get these things off the street." He said, "We need to—however you can get them, we need them off there." And I said I'd help him as long as there ain't no case. He said, "There's no case."

Q. What did you interpret that to mean?

A. He showed me a badge, a U.S. Marshal's badge. It was about this big around, has a top come up like that. I said, "Bring the Feds in." I'm the one that—"You know, I want some Feds because I've been in federal prison before. You know, these guns is federal."

Q. Okay. Any did he tell you—

A. I told him before—

Q. Let me ask a question. Did he tell you that his federal authority was not in law enforcement investigative connected [sic]?

A. No. He pulled—told me—I said I wouldn't do anything unless I have the Feds to help because it's too big.

[GOVERNMENT]: Say that again. I'm sorry, I object. I didn't hear that.

THE COURT: I didn't hear that either.

Q. Say it again.

A. I said I wasn't going to help unless the Feds was involved in it.

Q. Then what did he say in response?

A. He said he had no problems at all working with the Feds because – and he reached in his pocket and pulled out this round thing that has kind of a square top on it and says U.S. Marshal on it.

Q. What did you understand that badge to mean?

A. It said U.S. Marshal. My understanding is that that's a Fed, you know.

Q. And he never—did he ever tell you that that U.S. Marshal authority was limited or restricted in any way?

A. There was no restrictions I ever heard of when on a marshal. I know such thing as they declare martial law. That's the guy that runs everything, you know. You don't stop a marshal.

Q. Before you said anything about guns did either of the two law enforcement officers tell you that they had evidence against you for possession of stolen property?

A. Not that I recall.

THE COURT: Lean into that microphone there when you talk.

Q. Sorry, Your Honor. Sheriff Massey testified that the first contact between you and him regarding this

case was on January 16th in front of the McCalls'
residence. Do you recall that meeting?

A.  Yes, I do.

Q.  Do you recall who made the first invitation to a
conversation between you and him?

A.  It was him. Yes.

[End of direct examination]

As a result of the assertions made in his testimony
regarding Sheriff Massey, Baker claims that he became
shielded from prosecution for violating any federal firearm
laws. This entrapment by estoppel defense is based on
Massey's misrepresentation of his authority. But what
was the misrepresentation? A fair reading of Baker's
characterization of his conversation with Massey cannot
reasonably be understood to misrepresent to Baker that
Massey had the requisite federal authority to authorize
Baker to possess the firearms.

Assuming, as we must, all of Baker's facts are true, they
fall far short of supporting the defenses. A careful review of
the testimony reveals Massey did not say he was a U.S.
Marshal. The testimony was Massey displayed a badge and
said he "had no problems at all working with the Feds . . .
."

The police officers previously testified at the suppres-
sion hearing that Baker admitted to them that he had the
guns the entire time, and that he lied when he said he
sold them to a man in Chicago. There was also evidence
before the court that Baker had previously testified in a
state court hearing at which he admitted to having the guns
the entire time. Baker does not deny any of this at the
suppression hearing. In fact, he does not deny that he was
in possession of the guns the entire time. This unrebutted
evidence completely undermines Baker's ability to use the
defense, as his reliance could not have been reasonable or

in good faith if he was in possession of the guns, as opposed
to in the possession of the supposed buyer in Chicago. In
other words, even if there was indeed a misrepresentation
by Massey, such representation would have been made
based solely on what Baker had represented to Massey,
which turned out to be a total lie. The end result is that the
only unrebutted evidence before the court was Baker's
unreasonable reliance on Massey's alleged representation
that he authorized Baker to possess the firearms.

## D. Jury Instruction for the Public Authority Defense

Baker next argues the district court erred in refusing
to instruct the jury on the defense of public authority. We
review de novo a district court's decision not to instruct
the jury on a theory of defense. *United States v. Skoczen*,
405 F.3d 537, 545 (7th Cir. 2005) (citing *United States v.
Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003)). A defendant
is entitled to a theory of defense instruction if, inter alia,
the theory is supported by the evidence. *Howell*, 37 F.3d at
1203. As discussed above, Baker was properly precluded
from presenting this defense at trial. As a result, the
district court was not required to give a jury instruction
that was based entirely on facts that were not actually
introduced at trial and thus not supported by the evidence.
*See United States v. Baker*, 40 F.3d 154, 162 (7th Cir. 1994)
(concluding district court did not err by refusing to legiti-
mize a defendant's theory in the form of a defense instruc-
tion when there was nothing in the evidence to support the
theory).

## E. The Statutory Defense of 18 U.S.C. § 925(a)

Baker's final argument is that the district court erred
in refusing to instruct the jury on the statutory defense
contained in 18 U.S.C. § 925(a)(1). Baker's argument

borders on frivolous. The relevant statute provides: "The provisions of this chapter . . . shall not apply with respect to the transportation, shipment, receipt, possession, or importation of any firearm . . . imported for, sold or shipped to, or issued for the use of, the United States . . . or any State or any department, agency, or political subdivision thereof." The gist of Baker's argument is that "[s]ince recovering the stolen police-owned shotguns was undoubtedly an official police purpose, Mr. Baker's trial testimony that this was his exclusive purpose would, if believed, put him squarely within the exception of § 925(a)." There is no legal analysis whatsoever to support this statement. Furthermore, contrary to Baker's argument, there is nothing in the statute that addresses the *motives* of the *possessor*. Baker's assertion that "recovering the stolen police-owned shotguns was undoubtedly an official police purpose" is utterly irrelevant under the statute. Rather, it is the government's motivation that counts. Besides, the statute's effect has been to allow "members of the armed services and law enforcement agencies [i.e., *not* civilians] who might otherwise be prohibited from carrying firearms to do so in connection with their public responsibilities." *Gillespie v. City of Indianapolis*, 185 F.3d 693, 698 (7th Cir. 1999). Therefore, the district court did not err in refusing to instruct the jury on this defense.

## III. CONCLUSION

We conclude the district court's exclusion of the presentation of the entrapment by estoppel and public authority defenses, as well as the statutory defense contained in 18 U.S.C. § 925(a), was not error. We further conclude the district court properly refused to give the jury instruction for the public authority defense. The jury's verdicts will not be disturbed, and the convictions are AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*