In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2058

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARCHIE STALLWORTH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 948—**John F. Grady**, *Judge.*

ARGUED FEBRUARY 23, 2011—DECIDED SEPTEMBER 6, 2011

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* This case had its beginning in an undercover investigation that the Federal Bureau of Investigation (FBI) launched in 2007 with the hope of weeding out corruption in the Police Department of Harvey, Illinois. It found Officer Archie Stallworth engaging in a drug deal. This led to charges against Stallworth for attempting knowingly or intentionally to possess, with intent to distribute, a controlled substance,

in violation of 21 U.S.C. §§ 841(a) and 846. To make matters worse, before trial Stallworth forged a police report to make it appear as if all the while he had been conducting an undercover investigation himself. His effort resulted in an additional charge of falsifying a police report to impede an investigation, in violation of 18 U.S.C. § 1519. Stallworth was convicted on both counts and received a sentence of 12 years. On appeal, he has opted to employ the shotgun approach, raising six issues of varying degrees of merit. His arguments about entrapment, the exclusion from evidence of a recorded conversation, and the sufficiency of the evidence with respect to his intent to possess the drugs are substantial enough to warrant discussion here. His other points can be handled more summarily. In the end, we find no reversible error, and we thus affirm the district court's judgment.

## I

As part of the FBI's operation, Special Agent Carlos Vargas posed as the general manager of Skybox Gentleman's Club in Harvey, Illinois. Vargas's orders were to contact police officers and test their willingness to participate in drug transactions. In late April 2008 Stallworth went to Skybox while on duty to handle an incident involving a disruptive patron. The incident ended with Stallworth pepper-spraying the patron. Vargas happened to be away during that incident, and so he decided to visit the Police Department to find out what happened and to "meet and greet" Stallworth. This first

meeting between the two, on May 1, 2008, was short but fruitful; they discussed the possibility of Stallworth providing private security for Vargas. Shortly thereafter, Vargas offered Stallworth a two-man security detail job for $500 apiece. Stallworth declined but arranged for two of his colleagues, Officer Weathers and Officer Sneed, to provide security. Vargas and Stallworth kept in touch and, in late July 2008, Vargas offered Stallworth another security job. This time Stallworth accepted.

The job was straightforward. Stallworth picked up Vargas in his car and drove to a Denny's Restaurant parking lot. Once there, Vargas went to another vehicle and spoke to another undercover agent for several minutes. Stallworth kept a look-out. After Vargas returned from the meeting, Stallworth drove him home. For this minimal effort, Stallworth earned $300. But Vargas wanted more. As he put it, he wanted a chat with "Archie, and not Detective Archie, for a second." Stallworth accepted this not-so-subtle invitation to discuss Vargas's narcotics activity. Vargas explained the details of his drug transactions and Stallworth's proposed role. The basic idea was that Stallworth would be Vargas's muscle in a future drug exchange. Stallworth confirmed his willingness to participate, stating that he did not want to know what was being exchanged but that he would make sure that Vargas accomplished his task. Indeed, Stallworth went the extra mile, providing Vargas with tips on how to avoid police detection when engaging in these drug transactions.

The fateful day arrived on August 11, 2008. Vargas called Stallworth, offering to pay him $1,000 to help with

a job that involved picking up a drug shipment at the DuPage Airport. Stallworth agreed, and the two rendezvoused at Vargas's apartment. At Vargas's insistence, he was and remained armed throughout the operation. Vargas and Stallworth drove in separate cars to the airport. There they met a man who had three duffel bags purportedly containing 30 kilograms of cocaine. Vargas and Stallworth moved the three bags into Vargas's car. Vargas then opened the bags and showed Stallworth, over the latter's protest that he did not want to view the contents, powder appearing to be cocaine. (In fact, it was fake.) They both then drove, again separately, to a Target parking lot. At the exchange point, Vargas made a call to another undercover agent who came and picked up the drugs. Vargas paid Stallworth the agreed $1,000, and they went their separate ways.

In mid-November 2008, two FBI agents followed up with Stallworth about the August 11 transaction. Initially, they spoke to him at the Metra police offices in Chicago. Stallworth admitted that he had accompanied Vargas for the transaction but he denied knowing what was in the bags. He asked at that point to speak to his attorneys, while agreeing to reconvene shortly at the U.S. Attorney's office in Chicago. Once there, the FBI agents confronted Stallworth with all the evidence against him. Stallworth broke down, stating that he was not a dirty cop, but that he had "screwed up."

On November 19, 2008, the government charged Stallworth with attempting knowingly or intentionally to possess, with intent to distribute, a controlled substance,

in violation of 21 U.S.C. §§ 841(a) and 846. Before trial, Stallworth submitted a subpoena to the Harvey Police Department requesting a police report that had been written by his colleague, Officer Sneed, in May 2008. At that time, as part of the sting operation, Vargas approached Officer Sneed and Officer Weathers to guard some drugs. Weathers insisted that the Department had to be informed. Sneed said that he would take care of it and submitted a report to Commander Michael Neal. Sneed's report did not reveal Vargas's role in the case. After the FBI confronted Stallworth, Sneed asked Neal to submit the police report to the Chief of Police. Neal did so; at this point, the report was still the cursory version submitted in May 2008. But the version that came back in response to the subpoena had two extra pages that Stallworth had added. Inconsistent with department procedure, the two new pages were paper-clipped to the original, stapled report. Records also revealed that Sneed had logged an envelope containing the newly fashioned report into the Harvey Police Department evidence room. This too was against department protocol, as reports are not usually deposited into the evidence room. As a result, in addition to the possession count, Stallworth was charged with falsifying a police report to impede an investigation, in violation of 18 U.S.C. § 1519.

On September 25, 2009, a jury convicted Stallworth on both counts of the indictment. On April 21, 2010, he was sentenced to 12 years on each count, with sentences to run concurrently. This appeal followed.

## II

### A

Stallworth begins by arguing that the district court erred when it denied his request for an instruction on the defense of entrapment. To raise an entrapment defense, a defendant must show: "(1) that he was induced by a government actor to commit the crime at issue; and (2) that he was not predisposed to commit that crime." *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010). "When analyzing a defendant's predisposition to commit a crime, we consider: (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government. No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense." *Id.* We review *de novo* a district court's decision not to give a proffered instruction. *Id.*

The point of the entrapment inquiry is to distinguish those who were likely to commit a crime in any event from those who are pushed by the government into committing a crime that they would not otherwise have done. Only if the evidence could support a finding that a person is in the latter group is he or she entitled to an instruction on the entrapment defense. Logically, once it is apparent that a person is predisposed to commit

a particular crime, there is some likelihood that he will take that step at some time or another. In such a case, the government's actions simply make it easier for the government to apprehend him. A person who lacks predisposition, in contrast, in many cases would not have committed the crime at all but for the government's intervention. The government would have engaged in the fruitless activity of causing the very crime it wants to prosecute, and this has no societal benefit. *United States v. Manzella*, 791 F.2d 1263, 1269 (7th Cir. 1986).

This is why predisposition is so central to the entrapment inquiry. *United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999). Indeed, the inducement and predisposition inquiries frequently inform one another. If the government has done nothing at all, then it is obvious that it is not engaged in fomenting crime; if the government offers a transaction that is indistinguishable from an ordinary market-based deal, then it is also unlikely to influence the target to do something unusual. If, however, the facts could support a finding of inducement, then we must reach the crucial question of predisposition.

In the present case, we have no trouble saying that a jury could find that Vargas induced Stallworth. We thus turn to Stallworth's predisposition: was he the likely offender caught simply at a convenient time and place, or could the evidence support a conclusion that he was an innocent lured into crime by the government's actions? We see no error in the district court's conclusion that he was the former, for Stallworth has proffered little

to suggest that he was not predisposed to commit the crime. He states, and for present purposes we accept, that on the whole he was a man of good character and reputation. Then he correctly notes that the scheme initially was suggested by the government. Yet Stallworth showed no reluctance in participating and profiting from the deal—he even gave Vargas advice on how to avoid being caught in future drug transactions. Furthermore, as Stallworth concedes, the government's effort to induce Stallworth was not great. He was not subjected to any "unusual or unfair persuasion"; he was just offered an attractive, but reasonable, sum of money. *Hall*, 608 F.3d at 344 (using the "unusual or unfair persuasion" language in analyzing the fifth factor). We conclude that the district court properly rejected Stallworth's request for an entrapment instruction.

Related to Stallworth's entrapment theory is his argument that he was not engaged in a criminal transaction at all, but instead that he himself was running a sting operation designed to bust Vargas. In essence, he is raising the defense of public authority or entrapment by estoppel. The two defenses are similar. *United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006). Both require that a government official affirmatively communicate to the defendant that he is authorized to engage in certain conduct without incurring criminal liability. *Id.* The conceptual difference is that with the public authority defense the defendant engages in conduct that the defendant knows to be otherwise illegal but that has been authorized by the government, whereas with entrapment by estoppel the defendant, relying on the govern-

ment's statements, believes that his conduct is not pro-hibited. *United States v. Jumah*, 493 F.3d 868, 874 n.4 (7th Cir. 2007). In the rare case, this distinction might have some practical legal consequence: for entrapment by estoppel, the communication relied on may be from a government official acting with either actual or apparent authority. *Baker*, 438 F.3d at 753. In contrast, as our sister circuits see it, the public authority defense is limited to those situations where the communication was from a government official acting with actual authority, and not merely apparent authority. *Id.* at 753-54 (citing *United States v. Fulcher*, 250 F.3d 244, 254-55 (4th Cir. 2001); *United States v. Pitt*, 193 F.3d 751, 757-58 (3d Cir. 1999); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); *United States v. Duggan*, 743 F.2d 59, 83-84 (2d Cir. 1984)). We have not had occasion to address this, nor do we find it necessary to do so here.

For what it is worth, Stallworth's claim looks to us like a public authority defense. He was engaged in what he knew to be an illegal drug transaction, but he did so (he says) for law enforcement purposes that should insulate him from liability. But he forgets that under either the public authority defense or entrapment by estoppel, someone in the government would have had to authorize his actions. Here, there was no one, and so it makes no difference whether this nonexistent person had actual or apparent authority. Stallworth thus had no right to present either defense to the jury.

B

Stallworth also argues that the district court should not have excluded a recording of statements made by Officer Weathers. Weathers's testimony centered on his interactions with Vargas, Sneed, and Stallworth, as well as the fake report submitted by Stallworth and Sneed. Vargas had recorded many of his conversations with the officers. According to Stallworth, in one of them, Weathers warned Vargas that Stallworth was investigating him. This conversation, Stallworth maintains, bolsters his contention that he was conducting a secret sting operation and impeaches Weathers's testimony. The district court excluded the recording on two bases: First, the district court could not understand what it was that Weathers was communicating; and second, the district court ruled that even if it were to accept Stallworth's characterization of Weathers's statements, the recordings were inadmissible hearsay. We review evidentiary rulings for an abuse of discretion. *United States v. Serrano*, 434 F.3d 1003, 1004 (7th Cir. 2006).

Stallworth argues that the district court erred because it misunderstood the conversation and failed to realize that Weathers's statements fall in the state-of-mind exception to hearsay. Rule 803(3) exempts from the bar on hearsay "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." FED. R. EVID. 803(3). Stallworth contends

that the state of mind at play here is Weathers's belief that Stallworth was investigating Vargas. Even if we were to credit Stallworth's explanation of the conversation, however, the main reason to present Weathers's statement of belief would be to prove that Stallworth was in fact investigating Vargas. This would then be a statement of belief used to prove the "fact remembered or believed." This logic thus leads to the conclusion that Weathers's statement does not fit within Rule 803(3)'s hearsay exception.

Stallworth's final argument for admission of the recording is that he was trying to impeach Weathers. Stallworth notes that Weathers knew nothing of Vargas's undercover status. Stallworth's rather convoluted theory is that by showing that Weathers thought—rightly or wrongly—that Stallworth was investigating Vargas and that Weathers tried to warn Vargas about Stallworth's efforts, Stallworth could reveal that it was Weathers who was the dirty cop. This could then be used to impeach his testimony about the officers' interactions with Vargas.

Our biggest problem with the impeachment purpose is that Stallworth never suggested this to the district court. And as we said earlier, the biggest problem with the recording lies in the dubious nature of Stallworth's characterization of Weathers's statement. The conversation is mostly indecipherable, and given the tangential (at best) nature of its relevance, the district court did not abuse its discretion in excluding it.

C

Next, Stallworth contends that there was insufficient evidence to support the "intent to possess" element of his narcotics charge. He argues that he held the duffel bags for only a few moments. He never had control of the bags, he continues; he was just a human luggage trolley. Citing *United States v. Kitchen*, 57 F.3d 516 (7th Cir. 1995), Stallworth avers that this is not enough to establish attempted possession. We review challenges to the sufficiency of the evidence *de novo*, "consider[ing] the evidence in light most favorable to the government, drawing all reasonable inferences in its favor." *United States v. Aldridge*, 642 F.3d 537, 544 (7th Cir. 2011). "As long as a rational trier of fact could have returned a guilty verdict, the verdict will be affirmed*." Id.*

To prove the crime of attempted knowing or intentional possession, with intent to distribute, of a controlled substance, the government must show: (1) the defendant acted with the intent to possess a controlled substance with the intent to distribute; and (2) the defendant engaged in conduct which constitutes a substantial step toward commission of the offense. *United States v. Haddad*, 976 F.2d 1088, 1094 (7th Cir. 1992). The government could have established both the "intent to possess" and "substantial step" requirements without showing that Stallworth intentionally possessed the fake drugs. See, *e.g.*, *United States v. Jean*, 25 F.3d 588, 596 (7th Cir. 1994) (holding that a recorded negotiation was sufficient to establish the intent to possess); *United States v. Carrillo*, 435 F.3d 767, 777 (7th Cir. 2006) (holding

that, after negotiating a drug deal, arriving at the transaction's location with the required sum of money was sufficient to establish that defendant had taken a substantial step). But the government has chosen not to make any such argument, instead relying on Stallworth's putative possession of the fake drugs to establish his attempted possession. It has thus forfeited the more straightforward theory. We therefore focus on whether Stallworth intentionally possessed the fake drugs.

In fact, the evidence readily supports a finding of intentional possession. *Kitchen*, on which Stallworth relies most heavily, is distinguishable from our case. There a defendant held packages of cocaine for two to three seconds while he decided whether he wanted to carry out the transaction. *Kitchen*, 57 F.3d at 519-20. The defendant was immediately arrested before he made a decision on purchasing the drugs. The fact that he was still considering his next action was demonstrated by his comment that he was worried about the purity of the merchandise. *Id.* We held that this was insufficient to establish possession, because it was uncertain that the defendant would complete the transaction and walk away with the drugs. *Id.* at 522. There was no evidence that the defendant exercised control over the contraband.

Stallworth wants to characterize *Kitchen* as standing for the proposition that holding something for just a few seconds is categorically not enough for possession. But he is stressing the wrong thing—time, rather than control. In *Kitchen*, we recognized that the hallmark of possession is "the authority or the ability to exercise

control over the [object].*" Id.* at 523. In light of that, we reasoned that, if there is no evidence that the defendant exercised control over an object, the fact that the defendant merely held the object is insufficient to establish legal possession. *Id.* at 525. But we further stated that if there is evidence of control, even a momentary holding is sufficient to establish possession. *Id.*

Here, the question is whether Stallworth's actions demonstrated that he was exercising control over the duffel bags of fake drugs. Unlike the defendant in *Kitchen*, Stallworth was not caught in the twilight before the dawn of his decision. He decided to take the duffel bags of drugs to the car and did so. He had control over the bags, even if briefly, and he used that control to deposit them in Vargas's trunk. See *id.* at 522 ("By taking delivery of the drug and loading it into a briefcase or a van, a defendant clearly demonstrates [possession of the drugs].").

Stallworth responds that he was merely Vargas's lackey and did not have ultimate control over the drugs; thus, he was not in possession. Instructive on this point is *United States v. Hunte*, 196 F.3d 687 (7th Cir. 1999). There the defendant joined a group on a cross-country road trip for the purpose of purchasing and bringing back a load of narcotics. *Id.* at 689. The defendant's boyfriend was the leader of the group; he made most of the decisions and paid all expenses. *Id.* at 689-90. The defendant was shielded from most of the business aspects of the transactions, but she drove one of the vehicles containing the drugs and helped package and sample some

of them. *Id.* at 690. We held that this was sufficient to constitute possession. *Id.* at 693. In so doing, we stated, "The fact that one person leads and the others follow does not mean that only the leader has possession of the contraband. [The defendant] had access to the drugs at various times and assisted in their conceal-ment and transportation. As a group, [each member of the gang] exercised joint possession of the narcotics by virtue of their individual acts consistent with non-exclusive dominion and control over the contraband." *Id.* This perfectly describes Stallworth's situation. He followed Vargas's orders, but he had access to the fake drugs and helped transport them, thereby exercising joint control over them. Thus, a reasonable jury was entitled to conclude that Stallworth possessed the fake drugs.

With possession sufficiently established, we finally inquire into Stallworth's mental state: was his possession intentional? (Neither Stallworth nor the government address the element of "intent to distribute," and so we follow suit.) The Model Penal Code states that one acts intentionally, with respect to an element of the offense relating to his conduct, when "it is his conscious object to engage in" that conduct. MODEL PENAL CODE § 2.02(1)(a) (defining "purposely"); MODEL PENAL CODE § 1.13(2) (stating that "intentionally" means "purposely"). The evidence here was sufficient to establish that it was Stallworth's conscious object to possess what he thought were real drugs. Vargas explained the details of the drug transaction to Stallworth, and Stallworth replied that he would make sure the transaction went through.

Although Stallworth remarked that he did not want to know what was in the bags, the jury was entitled to view that as an effort not to get caught, and not as an unwillingness to engage in unlawful behavior. Moreover, even if the jury believed Stallworth was conflicted about his involvement with drugs, this does not necessarily negate his intentional possession. One can intentionally engage in conduct that he adjudges to be morally or legally wrong. The jury was entitled to conclude that, though Stallworth realized that aiding Vargas was contrary to his ethical obligations and the law, he purposely did it anyway for the money. We thus reject Stallworth's challenge to the sufficiency of the evidence supporting this conviction.

D

Stallworth also throws out a number of additional arguments that we deal with in short order. He argues that the government's conduct, in creating an elaborate fake drug ring, was so outrageous that it violated his due process rights. But there is a fatal problem with this point: Outrageous government conduct is not a defense in this circuit. *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008). Even if it were, we have noted in the past that there is nothing inherently outrageous about conducting a sting operation. See, *e.g.*, *United States v. Murphy*, 768 F.2d 1518, 1528-29 (7th Cir. 1985).

Next, Stallworth contends that the indictment was so unclear on the count of attempt to possess a controlled substance that it violated his Fifth and Sixth Amendment rights. As he correctly points out, there are a number

of different ways to violate 21 U.S.C. §§ 841(a) and 846: by attempted manufacture; attempted distribution; attempted dispensing; or attempted possession, with the requisite specific intent, of a controlled substance. See 21 U.S.C. §§ 841(a) and 846. Stallworth complains that the indictment did not properly signal which subset of illegal conduct he was charged with.

He assumes, however, that the government was obliged to include these specifics in the indictment. He is wrong. The Fifth and Sixth Amendment guarantees require only that an indictment accomplish "three functions: it must state each of the elements of the crime charged; it must provide adequate notice of the nature of the charges so that the accused may prepare a defense; and it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense." *United States v. Fassnacht*, 332 F.3d 440, 444-45 (7th Cir. 2003). We review the sufficiency of an indictment *de novo*. *Id.* at 444. This indictment satisfied those criteria. Count I charged "[that] defendant [] did attempt to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance . . . ." It also indicated that the operative facts were based on the August 11, 2008, transaction. That was enough.

Finally, in an attack on his conviction for falsifying a police report, Stallworth filed a motion for a new trial, complaining that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over surveillance recordings of the Harvey Police Department. The indictment states that the falsification happened between November 20, 2008, and December 5,

2008. The government turned over material from November 23 to December 2, but Stallworth also wanted the recordings from November 20 to November 23. The latter, Stallworth asserts, would have shown that he did not enter the station and falsify the report.

"For a *Brady* violation to exist, entitling a defendant to a new trial, he must establish (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it is material to an issue at trial. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different*." United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007). We review the denial of a motion for a new trial based upon an alleged *Brady* violation for an abuse of discretion. *Id.*

Here there is no indication that the government suppressed any evidence at all. The government turned over all the recordings it had—some 40 compact discs of video surveillance. It represented that it does not and did not have anything for Stallworth's desired dates. Stallworth suspects foul play, suggesting that the government suppressed the evidence by failing to preserve the recordings. He might mean one of two things: that the government knew the material was exculpatory and failed to preserve it, or that the government failed to preserve the recordings while recognizing that it was potentially exculpatory. There is a difference between how these situations are handled. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). The first is governed by *Brady*, while the defendant faces a more difficult burden in the second,

because the Due Process Clause does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 57-58.

Stallworth has no evidence that the government has ever known about the content of the missing recordings, and so his claim is not governed by *Brady*. For a *Youngblood* claim, the defendant must show: "'(1) bad faith on the part of the government; (2) that the exculpatory value of the evidence was apparent before the evidence was destroyed; and (3) that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) (internal citations omitted). We again review for abuse of discretion. *United States v. Kimoto*, 588 F.3d 464, 493 (7th Cir. 2009).

Other than his naked allegations, Stallworth presented no evidence of bad faith on the part of the government. No explanation was given for the missing material, but it is plausible that there is an innocent explanation. For example, the Harvey Police Department may have deleted the recording as a routine part of video record maintenance. Thus, Stallworth has not established the government's bad faith and his *Youngblood* claim fails. The district court did not abuse its discretion in denying Stallworth's motion for a new trial.

*   *   *

We therefore AFFIRM the judgment of the district court.