**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADRIAN CONTRERAS GRANADOS,

Defendant-Appellant.

No. 12-6030
(D.C. No. 5:11-CR-00125-F-1)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

Adrian Contreras Granados appeals his conviction for possessing five

kilograms or more of cocaine in violation of 21 U.S.C. § 844. We have jurisdiction

under 28 U.S.C. § 1291, and we affirm.

**BACKGROUND**

With a history of convictions for importing marijuana into this country from

Mexico, Mr. Contreras became a registered confidential informant for Immigration

---

[*]  After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and Customs Enforcement (ICE). But ICE "officially terminated" him from that position after only four months on October 11, 2010, after his cover was blown. R., Vol. IV at 326.

On November 14, 2010, police officer Eldon Halliburton performed a traffic stop on a vehicle driven alone by Mr. Contreras in Oklahoma. Mr. Contreras was extremely nervous, falsely claimed to own the vehicle, falsely claimed to be married to the woman the vehicle was registered to, could not recall the name of the city where he started from, and stated he was traveling to Wichita, Kansas. Officer Halliburton placed him in the patrol vehicle and radioed for permission to run his drug dog around Mr. Contreras's vehicle. When Officer Halliburton asked why Mr. Contreras was headed to Wichita, Mr. Contreras claimed he was an informant for the state department, ICE, and the Drug Enforcement Administration (DEA), and added he was driving to Wichita and then Chicago.

After Officer Halliburton's drug dog alerted to the presence of narcotics in Mr. Contreras's vehicle, Mr. Contreras repeatedly denied that it contained narcotics, but he consented to a vehicle search. Officer Halliburton and another officer conducted a search, finding over 21 kilograms of cocaine hidden in a "non-factory compartment." *Id.* at 38. They then handcuffed Mr. Contreras and placed him under arrest. Returning to Mr. Contreras's vehicle, the officers also found a post-it note with a phone number that Mr. Contreras asserted was for his government contact.

Later that day, Officer Halliburton called the number and spoke with Investigator Alejandro Rodriguez of the North Las Vegas Police Department. Investigator Rodriguez stated that "he had had contact with Mr. Contreras" in the past, but that Mr. Contreras "was not hauling the narcotics for them" and "was probably trying to . . . 'sneak one in under the radar.'" *Id*. at 40.

Mr. Contreras was indicted for possessing five kilograms or more of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). Before trial, he gave notice that he intended "to raise a defense of believed exercise of public authority," asserting that "he believed he was acting under the authority of the [DEA], or possibly other law enforcement agency with authority to investigate drug crimes (in particular the California Department of Justice/Bureau of Firearms, the Las Vegas Police Department, and/or [ICE]." R., Vol. I at 11. He also asserted that "he was acting at the direction of, and under the authority of, Francisco Espino[s]a Insunza, . . . a registered informant for one or more of the above listed agencies." *Id.*

At trial, Investigator Rodriguez testified that Mr. Espinosa was "signed up through [their] narcotics unit as an informant," *id*., Vol. IV at 60, and also "worked with an agency out of California," *id.* at 64. According to Investigator Rodriguez, Mr. Espinosa informed him on November 13, 2010, that "he had a vehicle loaded with cocaine headed towards Chicago," *id*., and that the driver, Mr. Contreras, "wanted to give up pretty much the load to law enforcement but did not want to be stopped with the vehicle," *id.* at 65. Investigator Rodriguez told Mr. Espinosa that

his office could not do anything with the information, but he gave Mr. Espinosa the name and phone number of a DEA agent in Chicago who Mr. Contreras could call to see if the DEA was interested.

Mr. Espinosa apparently gave Investigator Rodriguez's phone number to Mr. Contreras. Investigator Rodriguez testified to a brief telephone conversation with Mr. Contreras the day before he was arrested, in which he told Mr. Contreras simply "to reach out to Chicago contact when he got there." *Id.* at 70. Investigator Rodriguez was upset that Mr. Espinosa had given out his phone number, and he did not want to speak with Mr. Contreras because he was not signed up as an informant and he "didn't know who he was," *id.* at 81.

Mr. Espinosa testified that he and Mr. Contreras were friends, and that when he learned of the planned narcotics delivery, he told Mr. Contreras that he would "talk to [his] agent in Las Vegas and then . . . figure out what could be done." *Id.* at 249. According to Mr. Espinosa, when he called Investigator Rodriguez about the narcotics, Investigator Rodriguez told him "we cannot work" with such short notice and that he should tell Mr. Contreras to stop. *Id.* at 276. Mr. Espinosa stated that he told Mr. Contreras to stop, but for reasons unclear from Mr. Espinosa's testimony, Mr. Contreras proceeded onward. Finally, Mr. Espinosa testified he did not relay the DEA agent's contact information to Mr. Contreras and that he, himself, had not made contact.

Special agent Jose Cuellar from the California Department of Justice testified that Mr. Espinosa worked for him as an informant, and that Mr. Espinosa did not contact him about the delivery involving Mr. Contreras prior to his arrest. He further testified that Mr. Contreras had attempted on several occasions prior to his arrest to provide narcotics information, but he (Cuellar) told him that he could not work with him because Mr. Contreras was already employed by ICE. Further, Agent Cuellar indicated that he did not "in any way authorize Mr. Contreras's possession of" the cocaine. *Id.* at 117.

Mr. Contreras testified in his defense. He admitted that when he was recruited to transport the cocaine into the United States, he no longer was employed as an informant. He claimed, however, that Agent Cuellar had once told him "that any job we were going to do together we should do it through his informants . . . and then we would split the [payment]." *Id.* at 391. Consequently, Mr. Contreras approached Mr. Espinosa and asked him to "talk to [his] superiors and . . . see if they will give . . . the go-ahead [for] this job." *Id.* at 392. Espinosa purportedly called back and "said that his superiors said go ahead." *Id.* at 392-93. After passing through an immigration checkpoint on November 13, Mr. Contreras stated that he called Mr. Espinosa and told him, "Now you know everything is okay," to which Mr. Espinosa allegedly answered, "Yes, everything is under control." *Id.* at 409.

After the close of evidence, the district court turned to finalizing the jury instructions and announced it would not instruct the jury on Mr. Contreras's

public-authority defense.[1] The district court's ultimate reasoning is not in the record, but throughout the proceedings the judge expressed concern as to whether there would be any evidence showing that a government agent had authorized Mr. Contreras's actions.

During deliberations, the jury could not reach a verdict on the charged offense, but returned a guilty verdict on the lesser-included offense of simple possession. The court sentenced Mr. Contreras to 24-months' imprisonment, and he has since served that sentence and been released.

## DISCUSSION

Mr. Contreras argues that the district court erred by refusing to instruct the jury on the defense of public authority. "We review the district court's decision to give or to refuse a particular jury instruction for abuse of discretion." *United States v. Diaz*, 679 F.3d 1183, 1188 (10th Cir. 2012) (internal quotation marks omitted). But "[a] criminal defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Apperson*, 441 F.3d 1162, 1204 (10th Cir. 2006)

---

[1]    Mr. Contreras's proposed instruction read:

> If you find that Mr. Contreras was acting or reasonably believed he was acting on behalf of a law enforcement agency or officer when he engaged in the narcotics transaction charged in the indictment, then you must acquit him of this charge.

R., Vol. I at 36.

(internal quotation marks omitted). "A district court's failure to give such an instruction constitutes reversible error." *Id.* "The district court, however, is not required to give a theory of the defense instruction which lacks a reasonable legal and factual basis." *United States v. Gallant*, 537 F.3d 1202, 1233 (10th Cir. 2008) (internal quotation marks omitted).

"The public authority defense requires a defendant to show that he was engaged by a government official to participate in a covert activity." *Apperson*, 441 F.3d at 1204 (internal quotation marks omitted). And when the government official engages a defendant to participate in a violation of federal law, that official must actually have the authority to empower such a violation. *See United States v. Baker*, 438 F.3d 749, 754 (7th Cir. 2006) (noting that under the public-authority defense state and local law-enforcement officers generally cannot exempt violations of federal law). "[A]s our sister circuits see it, the public authority defense is limited to those situations where the communication was from a government official acting with actual authority, and not merely apparent authority." *United States v. Stallworth*, 656 F.3d 721, 727 (7th Cir. 2011) (collecting cases), *cert. denied*, 132 S. Ct. 1597 (2012). But this court has not yet decided whether apparent authority is sufficient for a public-authority defense.

Mr. Contreras does not contend that a government official with actual authority sanctioned his conduct. Rather, he claims that he reasonably believed he was exercising public authority based on his interactions with Mr. Espinosa and

Investigator Rodriguez.  We need not decide whether such a claim is cognizable under the public-authority defense because, even if it were, as we detail below, Mr. Contreras has shown no reasonable basis to justify a belief he was acting at the behest of any government official.[2]

Initially, we note that Mr. Contreras's public-authority notice did not mention Investigator Rodriguez, but instead relied solely on Mr. Espinosa.  But even if we overlook that omission, there is no evidence that Investigator Rodriguez encouraged Mr. Contreras or otherwise led him to believe he should proceed with the narcotics delivery.  Indeed, Investigator Rodriguez did nothing more than suggest to Mr. Contreras, after he had already begun his journey, to reach out to DEA in Chicago.  And he had told Mr. Espinosa, who was in contact with Mr. Contreras throughout the trip, that he (Rodriguez) could not do anything with the narcotics

---

[2]  Mr. Contreras argues that his public-authority defense is consistent with Federal Rule of Criminal Procedure 12.3(a)(1), which requires a defendant to give notice if he "intends to assert a defense of actual *or* believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense."  (Emphasis added.)  The Fourth Circuit has rejected just such an argument:

> Since Rule 12.3 is merely a notice provision and does not in any way alter the substantive legal standards with regard to the public authority defense, we agree with the Third Circuit's conclusion in [*United States v. Pitt*, 193 F.3d 751 (3d Cir. 1999)] "that the law in jurisdictions where actual authority was required was not altered" by the promulgation of Rule 12.3. 193 F.3d at 757.

*United States v. Fulcher*, 250 F.3d 244, 254 n.5 (4th Cir. 2001).  In any event, we need not decide the effect of Rule 12.3 on the public-authority defense given the lack of evidentiary support for Mr. Contreras's view of the defense.

delivery. Moreover, Mr. Espinosa testified that Investigator Rodriguez said to stop, and that he (Espinosa) relayed that command to Mr. Contreras. Even Mr. Contreras testified that the impetus for undertaking the delivery was not any specific communication with Investigator Rodriguez, but rather, some vague conversation with Agent Cuellar about working with Cuellar's informants. And even then, Agent Cuellar testified that he repeatedly told Mr. Contreras that he could not work with him.

Additionally, there is no evidence that would have justified Mr. Contreras's belief that he was working with the approval of government agents through Mr. Espinosa. Although Mr. Contreras testified that Mr. Espinosa had told him that his handlers had approved the controlled delivery, there is absolutely no corroborating evidence of such approval. Significantly, Mr. Contreras's own testimony suggests that he was pursuing the delivery on his own accord, as he claims to have reassured Mr. Espinosa after passing through a checkpoint, telling him, "Now you know everything is okay," R., Vol. IV at 409.

Mr. Contreras's behavior after being stopped by Officer Halliburton further belies his claim that he believed he was acting with government authorization. Indeed, he lied about everything from vehicle ownership to the presence of narcotics—even after he learned of the drug dog's alert.

In short, we see no evidence outside of Mr. Contreras's own, sometimes vague and contradictory testimony, that would have supported his defense-of-public-authority instruction.

## CONCLUSION

The judgment of the district court is AFFIRMED. We GRANT the government's unopposed motion to dismiss the sentencing component of this appeal as moot.

Entered for the Court


Jerome A. Holmes
Circuit Judge